# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Femi Joseph Daramola,                                   No. 24-CV-00761 (KMM/ECW)

      Plaintiff,

v.                                                                          **ORDER**

Dungarvin Minnesota, LLC,

      Defendant.

---

This matter is before the Court on Defendant Dungarvin Minnesota, LLC's ("Dungarvin") Motion for Summary Judgment. Pro se Plaintiff, Femi Daramola, was a Dungarvin employee until the company terminated his employment in February 2023. He claims that Dungarvin discriminated against him because of his race in violation of Title VII of the Civil Rights Act,[1] and Dungarvin argues that given the undisputed evidence in the record, no reasonable jury could find in Mr. Daramola's favor. Mr. Daramola also moves the Court to delay ruling on the summary judgment motion and for leave to conduct

---

[1] It should be noted that Mr. Daramola's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgement additionally discusses discrimination claims under 42 U.S.C. § 1981 and under the Minnesota Human Rights Act ("MHRA"). (Dkt. 92 at 2.) These claims were not included in the complaint, and a plaintiff generally may not use an opposition to a summary judgment motion to amend his complaint. *See Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014) (citing cases). However, even had these other theories of liability been raised in the complaint, the outcome would not change because both § 1981 and MHRA racial-discrimination claims are analyzed under essentially the same framework as Title VII claims. *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023). Mr. Daramola also suggests that he was terminated in retaliation for complaining about racial discrimination, but he neither pled those claims nor presented any evidence to support them.

additional discovery. For the reasons that follow, the Court denies Mr. Daramola's request for a continuance, grants Dungarvin's motion for summary judgment, and dismisses Mr. Daramola's discrimination claim.

## BACKGROUND

### *Mr. Daramola's Employment at Dungarvin*

In February 2022, Dungarvin hired Mr. Daramola as a Mental Health Specialist II, a position responsible for delivering care to vulnerable adults in residential settings. (Dkt. 92 at 3.) Mr. Daramola worked shifts at several Dungarvin facilities, including the Jordan home,[2] which is the residential setting where an incident occurred that Dungarvin says is the real reason it terminated Mr. Daramola's employment. (*See* Dkt. 89-7 at 8; Dkt. 86 at 4.) Mr. Daramola received site-specific training at the Jordan home on November 24, 2022 and again on January 20, 2023, as confirmed by his signed training documents and his deposition testimony. (Dkt. 89-2 at 4, 6; Dkt. 89-1 ("Pl. Dep.") at 286:21–287:14.) His training covered the "highly specialized" care protocols for a vulnerable adult resident of the Jordan home, who had a history of engaging in self-harm, and ingesting non-edible items, and who required continuous supervision. (Dkt. 89-7 at 2–3; Dkt. 89-3.)

To ensure constant supervision, the home maintained overnight staffing, consisting of one awake staff member and one asleep staff member. (Dkt. 89-7 at 2.) Mr. Daramola

---

[2] Mr. Daramola's primary work location was at a different facility known as the Utah home. (Dkt. 89-7 at 7.) The Jordan home is so-called because it is located in Jordan, Minnesota.

was also trained on the vulnerable adult's "Awake Overnight Protocol" which included the following:

- A staff will perform a room check before [vulnerable adult] enters her room to go to bed for any objects that might have been hidden that an be ingested or used for harm.
- Staff will sit in a chair at the side or foot of [vulnerable adult's] bed until she falls asleep.
- Staff can remain in the room after [vulnerable adult] falls asleep, or staff may sit outside of [vulnerable adult's] room once she has fallen asleep.
- If [vulnerable adult] should wake up and decide to remain in her bed, staff will sit in the room with [vulnerable adult].
- If [vulnerable adult] wakes in the middle of the night to use the bathroom, the Overnight staff will follow the Bathroom protocol.

- **There is no room for misunderstanding in these guidelines.** If you are unclear or have any questions, please talk to your supervisor.

(Dkt. 89-3.) Staff were also required to maintain constant visual supervision when the vulnerable adult was outside, including when smoking. (Dkt. 89-7 at 3.)

### *The January 20, 2023 Incident*

The incident that led to Mr. Daramola's termination occurred on January 20, 2023 at the Jordan home, where the vulnerable adult under Mr. Daramola's supervision sustained serious injuries. Mr. Daramola was scheduled to work the "awake overnight" shift, meaning that he was responsible for maintaining constant visual supervision of the vulnerable adult overnigh, while a co-worker, Angela Miller, worked the "sleep shift,"

meaning that she was at the facility but was able to sleep overnight. (Dkt. 89-7 at 3.)[3] At some point during the evening, the vulnerable adult went outside to smoke with Mr. Daramola's permission. (*Id*.)

The parties disagree about whether Mr. Daramola adequately supervised the vulnerable adult at that point. Mr. Daramola contends that he maintained visual supervision of the vulnerable adult while she was outside. He asserts that he did not follow her outside but watched her "from the window" and "could see her within eyesight when I was inside." (Dkt. 89-6 at 3.) He further states that she "did not go to the garage at all during my shift." (*Id*. at 5.) Mr. Daramola maintains that he has never slept during any of his shifts while employed by Dungarvin unless he was the sleep staff. (*Id*. at 5.)

In contrast, Defendant's investigation report of the incident states that onsite video footage contradicts Mr. Daramola's account. According to Dungarvin, the surveillance video shows Mr. Daramola "sitting on the couch for an extended period of time" while the vulnerable adult was outside, and that he seemed to be "sleeping for a period of time" because "his eyes appeared shut and he was reclined on the couch with the footrest up." (Dkt. 89-7 at 7.) Dungarvin's investigator also indicated that video footage shows the vulnerable adult walking toward the garage and returning approximately four to five minutes later. (*Id*.) The vulnerable adult told the investigator that, while she was outside, she went into the garage, found a jug of windshield washer fluid in a van, poured some into

---

[3] There is some dispute about whether Mr. Daramola was timely notified that his shift changed from a "sleep" shift to an "awake overnight" shift by the Jordan home supervisor, Lura Solie. However, this scheduling disagreement does not appear material to any fact relevant to Dungarvin's termination decision.

her water bottle, and drank it. (*Id*. at 2.) She stated that Mr. Daramola "did not check on her" while she was in her room and "did not watch her while she was outside." (*Id.*at 3.)

After returning inside, the vulnerable adult wrote a note stating "I just drank 40fl of windshield fluid" and provided it to Mr. Daramola. (Dkt. 89-6 at 4.) He immediately called the on-call supervisor, poison control, and 911. (Dkt. 89-7 at 3–4, 6.) The vulnerable adult was hospitalized at Regions Hospital for three days, requiring dialysis for methanol ingestion. (*Id*. at 6.)

### *Dungarvin's Investigation*

Following the incident, Dungarvin suspended Mr. Daramola and assigned Quality Assurance Manager, Marissa Sellner, to investigate. Mr. Daramola claims the investigation was flawed and suggests that it was not impartial. Specifically, he argues it was "structurally one-sided" with "limited opportunity to present competing evidence and witnesses," that Dungarvin "accepted conclusions favorable to Defendant without neutral review," and that he was not given "a fair and meaningful opportunity to respond before deciding termination." (Dkt. 92 at 4.) At his deposition, he called the investigation report a "forgery" (Pl. Dep. 246:20–25), and he asserted that Dungarvin convinced the investigator to "frame[ ] this document together to help with the lawsuit" (*id.* at 252:6–11).

Dungarvin, on the other hand, contends the investigation was thorough, fair, and in line with standard company procedures. Sellner explains that, as part of her investigation process, she collected and reviewed relevant documentation, as well as on-site video footage. (Dkt. 87 ¶¶ 3–4.) Sellner also conducted interviews with multiple witnesses, including the vulnerable adult, Mr. Daramola, Angela Miller, and day-shift staff members

Dawn Morales and Connie Parlow. (Dkt 87 ¶ 4.) On January 31, 2023, Sellner interviewed Mr. Daramola about the incident, drafted a statement based on his account, read it back to him, and he signed it after confirming its accuracy. Sellner denies changing the statement after it was signed by Mr. Daramola. (Dkt. 87 ¶¶ 4–5.) Sellner informed all interviewees, including Mr. Daramola, that she was not a decision-maker and final decisions would come from Dungarvin's operations team. (*Id*. ¶ 6.)

Sellner completed her investigation report on February 7, 2023, which referenced her findings from the video footage of the incident and the results of her interviews and the documents considered. The report determined that Mr. Daramola did not comply with the company's Awake Overnight Protocol, including failing to enter the vulnerable adult's room when required and providing inadequate supervision while she was outside. (Dkt. 89-7 at 7.) Her report ultimately concluded:

> [The vulnerable adult] went to the garage and obtained windshield washer fluid from the van and ingested it requiring dialysis for methanol ingestion. It was determined Mental Health Specialist, Femi Daramola did not follow [the vulnerable adult's] plans and failed to provide adequate supervision of [the vulnerable adult] thus resulting in harm to [the vulnerable adult].

(*Id.*)

### *The Termination Decision*

Caitlin Pope, one of Mr. Daramola's supervisors, reviewed Sellner's findings from the investigation and determined that involuntary termination was warranted per Dungarvin policies. (Dkt. 88 ¶ 10 (describing the company's decision to terminate Plaintiff's employment for gross negligence and failure to fulfill job responsibilities).) On

February 9, 2023, Pope attempted to contact Mr. Daramola to discuss the investigation results and left a voicemail stating:

> Hi, Femi. This is Caitlin giving a call. I wanted to reach out and review with you the determination from the investigations. I know you had met with [Sellner] before. So I wanted to kind of go over the results of that with you. Please do give me a call back at 612-261-9627 when you are able. Thank you, Femi.

(*Id.* ¶ 5; Pl. Dep. 209:16–23.) After Mr. Daramola did not return the call, Pope signed the termination paperwork later that day which cited "gross negligence and failure to fulfill responsibilities as policy violations resulting in termination." (Dkt. 88 ¶¶ 4, 10.)

Dungarvin's orientation materials authorize immediate termination for "gross negligence, including but not limited to, any situations that did or may have endangered the health or safety of the persons served or staff" or maltreatment of a vulnerable adult. (Dkt. 89-17 at 3.) Mr. Daramola admitted that he was aware of this policy and was these provided the PowerPoint orientation materials in his deposition. (Pl. Dep. 383: 5–12.) There is no evidence that Sellner or Pope made any references to Mr. Daramola's race in the investigation or in the context of the termination decision. Sellner and Pope heard no such remarks from other decision-makers. (Dkt. 87 ¶ 10; Dkt. 88 ¶¶ 8–9.)

### DHS Administrative Proceedings

To comply with its mandatory reporting requirements, Dungarvin informed the Minnesota Department of Human Services ("DHS") about the January 20, 2023 incident, and DHS conducted its own, independent investigation. DHS rejected Mr. Daramola's account of the incident, concluding that video footage supported the vulnerable adult's version of events more than that Mr. Daramola's. (Dkt. 89-11 at 6.) On March 31, 2023,

DHS issued a maltreatment determination finding Mr. Daramola responsible for neglect and disqualified Mr. Daramola from working directly with vulnerable adults. (Dkt. 89-11 at 8.)

Mr. Daramola filed an administrative appeal within DHS. After a two-day contested hearing in February 2024, a Human Services Judge found Mr. Daramola's testimony was not credible because it was "contradicted by some of [his] previous statements and by the video evidence submitted" and "his testimony and demeanor." (Dkt. 89-14 at 10.) On June 11, 2024, the Commissioner of Human Services affirmed the maltreatment determination.[4] (*Id*. at 15.)

### *Procedural History*

Mr. Daramola filed his complaint in this case on March 4, 2024. In it, he claimed that Dungarvin terminated him in violation of Title VII because he is Black, among several other claims. (Dkt. 1.) It took some time for Mr. Daramola to properly serve the complaint, and the Court denied two separate motions for default judgment as premature. (Dkts. 19, 21, 24, 34.) Eventually Dungarvin moved to dismiss the complaint for failure to state a claim (Dkt. 27), which the Court granted in substantial part but denied with respect to Mr. Daramola's Title VII race-discrimination claim (Dkt. 47).

On April 4, 2025, the Court issued a Pretrial Scheduling Order and referred Mr. Daramola to the Minnesota Chapter of the Federal Bar Association's Pro Se Project

---

[4] Mr. Daramola then appealed the DHS Commissioner's affirmance to the Scott County District Court, but his appeal was dismissed as untimely by Judge Christian S. Wilton. (Dkt. 89-13.)

for a consultation with a volunteer attorney. Discovery closed on November 17, 2025 (*see* Dkt. 61), and Dungarvin filed its motion for summary judgment on December 17, 2025. Mr. Daramola filed an opposition memorandum, and the matter was fully briefed when Dungarvin filed its reply on January 6, 2026. However, at the end of January, Mr. Daramola asked the Court to postpone any ruling on the summary judgment motion and to modify the scheduling order to allow him to take discovery (Dkt. 103), which the Court construes as a request under Federal Rule of Civil Procedure 56(d).[5]

## DISCUSSION

Dungarvin argues that it is entitled to summary judgment on Mr. Daramola's Title VII claim because Mr. Daramola has no direct or circumstantial evidence of discriminatory intent and no basis to assert that Dungarvin's legitimate, policy-based rationale for his termination was a pretext for discrimination. As explained below, the Court concludes that Mr. Daramola's claim does not survive summary judgement because, even assuming he has made out a prima facie case, he identifies no evidence that would support an inference that Dungarvin's proffered reason for his termination was pretextual.

## I.    Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Cearley v. Bobst Gr. N. Am. Inc.*,

---

[5] On February 10, 2026, United States Magistrate Judge Elizabeth Cowan Wright denied Mr. Daramola's motion to amend his complaint to assert a claim of disability discrimination under the Americans with Disabilities Act. (Dkt. 59; Dkt. 112.)

129 F.4th 1066, 1069 (8th Cir. 2025). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville*, 42 F.4th 918, 921 (8th Cir. 2022). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021).

A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Becker v. City of Hillsboro, Mo.*, 125 F.4th 844, 851 (8th Cir. 2025). "Like any other civil litigant, [a pro se litigant is] required to respond to defendants' motions with specific factual support for his claims to avoid summary judgment." *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001); *see also Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018).

## II.    Mr. Daramola's Rule 56(d) Request

Before turning to the merits of Dungarvin's summary judgment motion, the Court addresses Mr. Daramola's Motion to Modify the Pretrial Scheduling Order and for Leave to Conduct Limited Discovery. (Dkt. 103.) He asks the Court to postpone any summary judgment ruling and allow him to conduct additional discovery needed to respond to

Dungarvin's summary-judgment motion. He "served written discovery on October 30, 2025, . . . [but] Defendant objected on procedural grounds." (*Id.* at 2.) Further, he states that Dungarvin "objected to all written discoveries on timeliness grounds, resulting in no production **whatsoever** of documents uniquely within Defendant's possession." (*Id.* at 1.) Mr. Daramola submitted a declaration concerning discovery pursuant to Federal Rule of Civil Procedure 56(d) stating that he has a need for certain discovery. (Dkts. 108, 109.)

The Court denies Mr. Daramola's Rule 56(d).[6] Before ruling on a summary judgment motion, courts must give the parties sufficient time to engage in the discovery process, and a party opposing summary judgment can request a continuance to allow it to obtain adequate discovery. *See, e.g.*, *Dulany v. Carnahan*, 132 F.3d 1234, 1238 (8th Cir. 1997). Rule 56 provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to . . . take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). "The purpose of this rule is to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment." *Jackson v. Riebold*, 815 F.3d 1114, 1121 (8th Cir. 2016) (quotations omitted).

"A party seeking additional discovery under Federal Rule of Civil Procedure 56(d) has to show: (1) that he has set forth in affidavit form the specific facts that he hopes to

---

[6] Dungarvin responded to Mr. Daramola's motion by asking the Court to strike it on procedural grounds. (Dkt. 111 ("[Dungarvin] respectfully requests that Plaintiff's Motion to Modify the Pretrial Scheduling Order and for Leave to Conduct Limited Discovery . . . be stricken for failure to comply with Rule 7.1 of the Local Rules for the . . . District of Minnesota.").) Because the Court finds the motion should be denied for other reasons, the Court declines to address this argument.

11

elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are essential to resist the summary judgment motion." *Yassin v. Weyker*, 39 F.4th 1086, 1091 (8th Cir. 2022) (cleaned up). In addition, the party seeking the continuance "must show 'good reason for being unable to present facts essential to its response.'" *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1054 (8th Cir. 2007) (quoting *Alexander v. Pathfinder, Inc.*, 189 F.3d 735, 744 (8th Cir. 1999)).

The Court finds that Mr. Daramola has not provided a good reason for being unable to present facts essential to his response and denies his Rule 56(d) motion because he did not diligently pursue discovery. *See Mehner v. Furniture Design Studios, Inc.*, 143 F.4th 941, 951–52 (8th Cir. 2025) (affirming denial of Rule 56(d) motion where the plaintiff requested a continuance to allow completion of discovery after discovery period had closed); *Beatty v. Synthes (USA)*, 101 F. App'x 645, 646 (8th Cir. June 28, 2004) (per curiam) (finding no abuse of discretion in district court's denial of request for continuance where the plaintiff did not "vigilantly . . . prepare her case in a timely manner"); *Hart v. Opaa! Food Mgmt., Inc.*, 244 F. Supp. 3d 969, 975 (W.D. Mo. 2017) (denying Rule 56(d) request where the plaintiff "failed to offer an explanation as to why she couldn't have conducted the discovery she seeks in the time period between February and June 2016"). Mr. Daramola does not make the required showing under Rule 56(d).

Following a Rule 16 conference in April 2025, United States Magistrate Judge Elizabeth Cowan Wright issued a Scheduling Order setting a deadline of October 16, 2025 for completion of fact discovery. (Dkt. 55 at 3.) Specifically, the Order provides that "[t]he parties must commence fact discovery procedures in time to be completed on or before

October 16, 2025." (*Id.*) Judge Wright later extended the deadline for completion of fact discovery by 30 days. (Dkt. 61.) This created a new discovery cutoff of November 17, 2025, meaning that fact discovery procedures would need to be commenced in time to be completed by November 17th.[7] On November 18, 2025, Judge Wright reopened discovery for the limited purpose of completing Mr. Daramola's deposition, but that did not otherwise reopen the period for fact discovery. (Dkt. 83.)

To comply with the November 17th deadline for completion of fact discovery, Mr. Daramola was required to serve any written discovery requests at least 30 days before that deadline. Fed. R. Civ. P. 34(b)(2)(A) ("The party to whom the request is directed must respond in writing within 30 days after being served[.]").He failed to do so. By his own admission, he did not serve document requests on Dungarvin until October 30, 2025. Therefore, he did not commence fact discovery procedures in time to be completed by the deadline established by the Scheduling Order. *See Mallak v. Aitkin Cnty.*, No. 13-cv-2119 (DWF/LIB), 2016 WL 8607391, at *11–12 (D. Minn. June 30, 2016) (finding that Rule 34 requests must be served at least 30 days before the deadline absent an agreement or order), *aff'd,* 2016 WL 8607392 (D. Minn. Sept. 29, 2016).

Nor do his submissions provide any explanation for why he waited until the very end of the fact-discovery period to serve requests for written discovery. Mr. Daramola

---

[7] Thirty days after October 16, 2025 was Saturday, November 15, 2025. However, under Fed. R. Civ. P. 6(a)(1)(C), if the last day of a period is a Saturday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday. That means that the 30-day extension granted by Judge Wright required fact discovery procedures to be commenced in time to be completed by November 17, 2025, the next day that was not a weekend or legal holiday.

could have served the same document requests on Dungarvin that he propounded at the end of the discovery period immediately after the Rule 16 conference. Instead, Mr. Daramola waited until discovery was nearly closed to make his first attempt to obtain evidence he now claims is critical to his case.[8]

It is not lost on the Court that Mr. Daramola is a nonlawyer who is representing himself in this litigation. Even experienced litigators who do not frequently handle cases in federal court can sometimes find it challenging to both adhere to all procedural rules and accomplish all that needs to be done in their cases in compliance with court-imposed deadlines. That is an even more difficult task for a pro se plaintiff like Mr. Daramola, and as a result, courts are often careful not to elevate form over substance when applying procedural rules. But Mr. Daramola is still required to comply with procedural rules and the Court's Orders. Judge Wright made this reality clear to him from the early stages of this case:

> Plaintiff is . . . advised that although he is pro se, he still must comply with the Local Rules for the District of Minnesota, the Federal Rules of Civil Procedure, and this Court's Orders. *See, e.g.*, *Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005) ("Even pro se litigants must comply with court rules and directives."); *Bennett v. Dr. Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002) (pro se status does not entitle litigant to disregard Federal Rules of Civil Procedure or court's local rules); *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984)

---

[8] Mr. Daramola also asks the Court to modify the Scheduling Order and extend the discovery deadline. Good cause is required to support such a modification, Fed. R. Civ. P. 16(b)(4), and the primary measure of good cause is whether a party could not have met a deadline despite the exercise of reasonable diligence, *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716–17 (8th Cir. 2008). Mr. Daramola's lack of diligence and the absence of any explanation why he could not have requested discovery undermine his request for modification of the schedule.

> ("[P]ro se litigants are not excused from failing to comply with substantive and procedural law.")

(Dkt. 55 at 2; *see also* Dkt. 56 at 1.)

Despite these admonitions, Mr. Daramola did not pursue discovery in time to comply with the Scheduling Order's deadline for completion of fact discovery. Reopening discovery so that Mr. Daramola can do now what he had plenty of time to do earlier would be unwarranted and risk turning the Scheduling Order into a meaningless piece of paper. *See Architectural BusStrut Corp. v. Target Corp.*, No. 19-cv-968 (DSD/ECW), 2021 WL 2646808, at *4 (D. Minn. Mar. 8, 2021) (explaining that "Rule 16(b) assures that a magistrate judge's scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril") (cleaned up). It would also be unfair to Dungarvin to delay a ruling on its motion for summary judgment, require it to respond to discovery that it expected would be over in mid-November, and deprive it of a timely resolution on the merits of Mr. Daramola's claims

For these reasons, the Court denies Mr. Daramola's Motion to Modify the Pretrial Scheduling Order and for Leave to Conduct Limited Discovery and turns to the merits of his employment discrimination claim through the summary judgment lens.

## III. Mr. Daramola's Title VII Claim

### A. Title VII Standards

Mr. Daramola's claim in this case arises under Title VII of the Civil Rights Act and is based on race discrimination. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a).

"A plaintiff may prove unlawful racial discrimination through either direct or circumstantial evidence." *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019). Direct evidence is "evidence showing a specific link between alleged discriminatory animus and the challenged decision, sufficient to support a finding . . . that an illegitimate criterion actually motivated the adverse action." *Bone v. G4S Youth Servs., LLC.*, 686 F.3d 948, 954 (8th Cir. 2012) (quotation omitted). Where the plaintiff's evidence is only circumstantial, "she must proceed under the framework laid out in *McDonnell Douglass*[.]" *Lucke*, 912 F.3d at 1087 (citing *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973)).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case by providing sufficient circumstantial evidence to "giv[e] rise to an inference that she has been intentionally discriminated against because of her race." *Id.* Once a plaintiff does so, the burden shifts to the defendant to "show a 'legitimate, non-discriminatory reason' for the challenged conduct." *Id.* (quoting *Young v. Builders Steel Co.*, 754 F.3d 573, 577–78 (8th Cir. 2014)). If the defendant makes that showing, "the burden shifts back to the plaintiff to show that the offered reason is pretextual" and that "discrimination was the real reason" for the adverse employment action. *Id.* at 1088 (quotation omitted).

## B.  Direct Evidence

First, the Court finds no direct evidence of discriminatory intent. In his deposition, Mr. Daramola references the February 9, 2023 voicemail from Caitlin Pope and suggests

that it constitutes direct evidence. He asserts that Pope's message showed that he "did nothing wrong" and that Dungarvin "admitted to every claim" he had raised. (Pl. Dep. 213:7–12, 397:18–20). A review of the voicemail transcript, however, reveals that Pope made no such admission on behalf of Dungarvin or otherwise. The message makes no reference to Mr. Daramola's race and provides no substantive findings regarding the investigation. Pope even clarifies that the voicemail was a standard notification to discuss the outcome of the investigation and to provide Mr. Daramola with an opportunity to ask questions or receive clarification. (Dkt. 88 ¶¶ 6–7.) No reasonable jury could find that Ms. Pope's voicemail constitutes evidence that Dungarvin terminated Mr. Daramola's employment because of his race.

### C. Burden Shifting Analysis

In the absence of direct evidence of discrimination, the Court evaluates his claims under the three-step burden-shifting framework of *McDonnell Douglas*.

#### 1. Prima Facie Case and Legitimate Nondiscriminatory Reason

The Court assumes that Mr. Daramola has established a prima facie case of discrimination, so the Court does not address the first step in detail.[9] The second is step is satisfied: there is no genuine disagreement that Dungarvin has met its burden to articulate a legitimate, nondiscriminatory reason for Mr. Daramola's termination. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (explaining that the employer's

---

[9] *See Corkrean v. Drake Univ.,* 55 F.4th 623, 631 (8th Cir. 2022); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006) (declining to address prima facie case where plaintiff failed to show pretext).

burden to articulate a nondiscriminatory reason is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence). Dungarvin has presented evidence showing that it terminated Mr. Daramola because he failed to adequately supervise a vulnerable adult in violation of required protocols, resulting in serious harm that required the vulnerable adult's hospitalization and dialysis. This termination was consistent with Dungarvin's written policies authorizing immediate discharge for gross negligence endangering persons served.

### 2. Pretext

Most of the dispute between the parties here focuses on step three. Since Dungarvin has provided a legitimate, nondiscriminatory reason for Mr. Daramola's termination, the burden shifts back to Mr. Daramola to point to evidence that would allow a reasonable jury to conclude that Dungarvin's proffered reason was pretext for racial discrimination. To show pretext, Mr. Daramola must provide evidence allowing a reasonable jury to infer either that "the employer's explanation is 'unworthy of credence . . . because it has no basis in fact,'" or "by persuading the court that a [prohibited] reason more likely motivated the employer." *Torgerson*, 643 F.3d at 1047 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1069, 1120 (8th Cir. 2010)); *see also Banford v. Bd. of Regents of Univ. of Minn.*, 43 F.4th 896, 900 (8th Cir. 2022) (same). Mr. Daramola "must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Barnhardt v. C.H. Robinson Worldwide, Inc.*, 742 F.3d 365, 371 (8th Cir. 2014). And Daramola's "burden to show pretext merges with the ultimate burden of persuading the court that [he] was the victim of intentional discrimination." *Banford*, 43 F.4th at 900 (cleaned up).

A plaintiff commonly persuades the court that discrimination was the true motive for termination by showing that the defendant "fail[ed] to follow its own policies, treat[ed] similarly situated employees differently, or shift[ed] its explanation for the employment decision." *Pilot v. Duffy*, 143 F.4th 924, 929 (8th Cir. 2025); *Winters v. Deere*, 63 F.4th 685, 690 (8th. Cir. 2023).[10] In his opposition memorandum, Mr. Daramola argues that a reasonable jury could find pretext for four reasons: (1) disparate treatment of similarly situated employees; (2) deficiencies or irregularities in Dungarvin's investigation; (3) selective or inconsistent application of the "gross negligence" label; and (4) the rapidity and finality of termination compared to alternatives. However, Mr. Daramola does not point to evidence in support of any of these theories of pretext sufficient to overcome Dungarvin's summary judgment motion.

### *Similarly Situated Employees*

First, Mr. Daramola contends that Dungarvin treated similarly situated employees of a different race more favorably and that this disparate treatment supports an inference of pretext. When considering pretext, comparators must be "similarly situated in all relevant respects," including that the comparators have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 809 (8th Cir. 2020); *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003);

---

[10] To show that an employer's stated reason for taking the adverse employment action is pretextual because it is "unworthy of credence," a Title VII plaintiff must show that "it has no basis in fact." *Pilot*, 143 F.4th at 929. Mr. Daramola has not made such a showing in this case.

*McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 600 (8th Cir. 2020) (quoting *Bone*, 686 F.3d at 956).

The Court finds that Mr. Daramola has not presented evidence of an appropriate comparator. He identifies no other Dungarvin employee of a different racial group who is similarly situated to him in all relevant respects and who received more favorable treatment. Mr. Daramola argues that "the comparator inquiry is context-specific, and it is not the only way to establish an inference of discrimination or pretext." (Dkt. 92 at 12.) He further asserts that the Eighth Circuit's standard is not a "rigid requirement" of "identical" comparators (*Id.*)

At summary judgment, the burden to provide evidence of comparators is on the plaintiff opposing summary judgment, and the Court cannot disregard controlling Eighth Circuit precedent requiring meaningful similarity. Under that standard, "the test is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing [himself] to the other employees" *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th. Cir. 2008). Under this standard, Mr. Daramola must still identify at least one employee who is similarly situated to him in the relevant respects and show that the comparator was treated more favorably than he was. Even when the record is viewed in the light most favorable to Mr. Daramola, he has not met his burden.

At his deposition, Mr. Daramola asserted generally that "about ten white people" were treated more favorably, but he could only specifically name three: Angela Miller, Luke Davies, and Lura Solie. (Pl. Dep. 179:1–8.) When asked to identify the remaining

20

individuals, he conceded, "I don't remember their name[s], but there are up to ten in numbers." (*Id.* at 180:18–20.) Such vague and unsupported assertions are insufficient to create a genuine issue of material fact. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th. Cir. 2006) ("General allegations of discrimination are not sufficient to defeat summary judgment.").

Even as to the three Dungarvin employees he identified by name, Mr. Daramola fails to establish that they are similarly situated in any meaningful respect, let alone all relevant respects. The record reflects that these employees held different positions, had different job responsibilities, or reported to different supervisors.[11] Additionally, Mr. Daramola admitted he lacked specific knowledge of their disciplinary history or what misconduct they allegedly committed, undermining his assertion that discipline was applied inconsistently. (Pl. Dep. 119:20–25; *id.* at 120:1–8; *id.* at 177:18–180:8; *id.* at 184:8–188:3; *id.* at 273:21–275:25.) Most critically, he offers no evidence that any of these employees were involved in incidents where alleged supervision failures led to serious harm to a resident, but were disciplined less severely.

Mr. Daramola argues that requiring a pro se plaintiff to identify valid comparators would "effectively immunize discrimination in workplaces" where employees lack access to personnel records and disciplinary details. (Dkt. 92 at 13.) But even a pro se plaintiff

---

[11] Lura Solie was a supervisor, holding a different position with different responsibilities. (Pl. Dep. 271:23–272:21.) Angela Miller was assigned to the sleep shift at the time of the incident and was neither investigated for similar conduct, nor does the record suggest she was implicated in the January 20, 2023 incident that led to the vulnerable adult's hospitalization. (Dkt. 86 at 15.) No details were provided by Mr. Daramola regarding Luke Davies' employment circumstances or treatment.

can resort to the discovery process to obtain information about relevant comparators. As explained above, Mr. Daramola failed to diligently pursue discovery of information concerning potential comparators, so he cannot now complain that summary judgment is improper because he lacks access to information he could have obtained through a timely discovery request.

Mr. Daramola's argument that Dungarvin applied the "gross negligence" label inconsistently to employees subject to discipline similarly fails. He argues that a jury "may consider whether Defendant seized on one employee for the harshest sanction while ignoring comparable failures by others outside the protected class." (Dkt. 92 at 12.) But Mr. Daramola does not identify any other employee who violated safety protocols resulting in comparable harm yet was not labeled as having engaged in gross negligence or was not terminated. When questioned at his deposition whether he knew of any non-Black employees found to have committed gross negligence who was retained, he responded:

> I'm not an investigative reporter, but what I know based on my opinion on the company is that a lot of issues like that happened between staff and client. But instead of letting staff go, they retained them to continue working because they are white.

(Pl. Dep. 321:8–16.) Instead, he testified that "[i]t is not my responsibility to name one person" who has been under a maltreatment investigation and received a more lenient discipline for similar conduct. (*Id.* at 416:10–11.) Nor does he cite any Dungarvin policy or practice that would preclude immediate termination for the conduct at issue here. Mr. Daramola's personal belief about inconsistent application is not enough.

Finally, Mr. Daramola suggests that "staff who were present, supervisors responsible for staffing, or employees who violated safety protocols in comparable ways" might not have been terminated and argues that "if other employees . . . were not terminated, that difference would support pretext." (Dkt. 92 at 13–14.) While disparate treatment of similarly situated employees of different races can support an inference of discriminatory motive, this broad assertion does not create a genuine dispute for a jury to resolve. When asked whether he could provide information about others who were treated more favorably following a similar incident, Mr. Daramola admitted, "I don't have information. . . . What I'm trying to say here is that I do not have paperwork." (Pl. Dep. 397:9–18.) Absent the identification of specific individuals, he cannot demonstrate that any purported comparators were similarly situated in all relevant respects or that they engaged in comparable safety violations resulting in similar harm yet received lesser discipline. Accordingly, his argument rests on speculation and is insufficient to create a genuine dispute of material fact.

### Dungarvin's Investigation Process

Mr. Daramola's second argument regarding pretext alleges deficiencies in Dungarvin's investigation and termination process. Specifically, he argues that Dungarvin's investigation was "structurally one-sided, with limited opportunity to present competing evidence and witnesses," that Dungarvin "accepted conclusions favorable to [the company] without neutral review," and that he was not provided "a fair and meaningful opportunity to respond before deciding termination." (Dkt. 92 at 4.) He also disputes Dungarvin's interpretation of the video evidence and challenges the completeness and

23

fairness of the investigation. Through these arguments, Mr. Daramola essentially suggests that a jury could find Dungarvin's proffered reason for his termination was pretext for a discriminatory motive because the company failed to follow its own policies and its stated rationale is unworthy of credence. *See Pilot*, 143 F.4th at 929. But the Court finds no evidence in the record sufficient to raise a genuine dispute of material fact on any of these points.

As a threshold matter, the critical inquiry is not whether Dungarvin's investigation was perfect or whether its conclusions were correct, but whether Dungarvin honestly believed its stated reasons for termination. *Twymon*, 462 F.3d at 935 ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination."); *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) ("If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. . . . To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules.").

Mr. Daramola argues that the Court may not rely on "honest belief" and "business judgment" to ignore evidence of bias. (Dkt. 92 at 4.) However, the honest-belief rule places the burden on the plaintiff to present evidence that supports an inference that the employer did not truly believe the stated reason for its decision to discipline or terminate the employee. *Scroggins v. University of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000) (rejecting

24

a discrimination claim where an employee could offer no evidence suggesting anything other than the [employer's] honest belief that the employee was sleeping on the job.) Mr. Daramola has not met that burden. He has not presented evidence showing that Dungarvin's investigation was conducted differently because of his race, that the decision-makers did not genuinely believe their stated reasons, or that the investigation was designed to reach a predetermined discriminatory outcome.

Turning to Mr. Daramola's criticisms of the investigation, the Court is not persuaded that Mr. Daramola has presented sufficient evidence to show the investigation was so one-sided that it is unworthy of credence. *Cf. Torgerson*, 643 F.3d at 1047 (explaining that a "plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact") (cleaned up). To the contrary, the record shows that multiple independent fact-finders thoroughly reviewed objective evidence and did not surface any new or competing factual findings. Sellner conducted an investigation that included reviewing documentation, interviewing Mr. Daramola and other witnesses, and examining video footage. The investigation separated the investigator from the decision-maker. Dungarvin's internal findings were later corroborated by an entirely independent investigation conducted by DHS, which reached the same conclusions about what occurred

on January 20, 2023.[12] While DHS's post-termination findings are not the basis for Dungarvin's decision, the fact that multiple independent fact-finders reviewing the same evidence reached the same conclusions undermines Mr. Daramola's argument that Dungarvin's investigation was biased or that its conclusions were false. *Johnson v. AT&T Corp.*, 422 F.3d 756, 762–63 (8th Cir. 2005) (rejecting plaintiff's argument that alleged inadequacies in the company's investigation satisfied the burden to demonstrate pretext because the circumstances did not call into question whether the real reason for plaintiff's termination was his race).

Mr. Daramola argues that the investigative report is not a neutral review and that a jury "may find that an investigation was designed to justify a predetermined outcome, selectively credited witnesses, ignored contrary evidence, or applied harsher standards to a protected employee." (Dkt. 92 at 8.) Again, Mr. Daramola has not presented evidence to support any of these claims, and thus, he has not shown that Dungarvin's failed to follow its own policies or that its explanation for why he was terminated is unworthy of credence. He does not identify what contrary evidence was ignored by Dungarvin, which witnesses were selectively credited, or how Dungarvin applied harsher standards to him than to another employee accused of maltreatment of a vulnerable adult in the company's care.

---

[12] This evidence is uncontroverted and undermines Mr. Daramola's assertion that he was deprived of an opportunity to present his account and respond to the investigation. The record shows Mr. Daramola was interviewed by and given the chance to tell his side of the story; he received a summary of his statement for review, which he read and signed without raising any objections; and before Dungarvin finalized the termination, Pope attempted to reach Mr. Daramola to discuss the investigation findings and provide an opportunity to ask questions or receive clarification, but he did not return her call.

His speculation about what "may" is not proof that would allow a reasonable jury to find in his favor.

In sum, Mr. Daramola's complaints about the investigation provide no basis for the Court to conclude that he has presented a triable question of fact on the issue of pretext.

### Discipline for "gross negligence"

As noted above, Mr. Daramola raises concerns with Dungarvin's determination that he engaged in gross negligence within the meaning of its policies. To the extent he suggests that Dungarvin failed to follow its own policies in its handling of the investigation and imposition of discipline, the record does not support that claim. Dungarvin's written policies expressly and unambiguously authorize immediate termination of an employee for gross negligence in any situation that did or may have endangered the health or safety of its residents. The undisputed evidence shows that a vulnerable adult under Mr. Daramola's supervision ingested toxic fluid and required hospitalization and dialysis. This falls within the category of conduct endangering the health and safety of persons served, makin ghte discipline imposed consistent with company policies.

### Rapidity and finality of termination to alternatives

Finally, Mr. Daramola suggests that the speed of his termination and the decision to fire him as opposed to imposing less definitive discipline supports an inference of pretext. The incident occurred on January 20, Dungarvin suspended Mr. Daramola on January 24, the investigator interviewed him on January 31, the investigation concluded on February 7, and Dungarvin terminated his employment on February 9. Even viewing this timeline of events in the light most favorable to Mr. Daramola, there is no evidence here that supports

an inference of pretext. Dungarvin was investigating an incident involving serious harm to a vulnerable adult, so it is no surprise that the company sought to determine what occurred quickly and respond to the results of its investigation definitively. Mr. Daramola points to no evidence showing that Dungarvin deviated from its own policies in approaching the investigation in this way. There is similarly no evidence that comparable investigations were conducted differently or that other employees were afforded additional time before termination under similar circumstances. Absent such evidence, the speed of Dungarvin's response to the incident does nothing to support an inference of discrimination.

### CONCLUSION AND ORDER

Mr. Daramola has not presented sufficient evidence to create a genuine dispute of material fact on whether Dungarvin's stated reason for terminating him was pretext for race discrimination. The Court recognizes that Mr. Daramola genuinely believes he was treated unfairly and that the investigation was one-sided, but employment discrimination claims require specific evidence that the employer's stated nondiscriminatory reason was false and that discrimination was the real motivation. Mr. Daramola's sincere belief alone cannot substitute for evidence. Viewing all facts and reasonable inferences in Mr. Daramola's favor, no reasonable jury could conclude that race discrimination motivated Dungarvin's decision to terminate him. Accordingly, **IT IS HEREBY ORDERED THAT**

1. Plaintiff's Motion to Modify the Pretrial Scheduling Order and for Leave to Conduct Limited Discovery (Dkt. 103) is **DENIED**.

2. Defendant Dungarvin Minnesota, LLC's Motion for Summary Judgment (Dkt. 85) is **GRANTED**.

28

3.  This action is **DISMISSED WITH PREJUDICE**.

**Let Judgment be entered accordingly.**


Date: April 23, 2026                                     _s/ Katherine Menendez_
                                                        Katherine Menendez
                                                        United States District Judge